OLD MORTGAGE & FINANCE CO. *v.* PASADENA LAND CO.

1. CORPORATIONS — CONTRACTS BETWEEN CORPORATIONS AND CONFIDENTIAL AGENTS CAREFULLY SCRUTINIZED.

   While contracts between agents of the corporation occupying positions of trust and confidence and a corporation fairly entered into and honestly executed, where no one is defrauded or overreached, are not necessarily invalid, such contracts will always be scrutinized with jealous care by courts to see that no advantage is taken of the corporation or the rights and interests of its stockholders jeopardized.

2. SAME—CONTRACTS BETWEEN CORPORATION AND OFFICERS VOIDABLE IF UNFAIR TO STOCKHOLDERS.

   Officers of a corporation may deal with it in good faith if their acts are fair, open, and known to the directors and stockholders; such contracts are not absolutely void, but they are voidable at the election of the party whose interest has been so represented by the party claiming under it.

3. SAME—CONTRACTS—RIGHTS OF THIRD PERSONS.

   If a third person join with a corporate officer in dealing with the corporation, with knowledge that he is such officer, the contract may be set aside as to him as well as the corporate officer upon the theory that where a stranger participates with such officer of a corporation in the commission of an act of manifest bad faith or breach of duty to it, he, equally with the officer, commits a wrong and ought not to derive profit from it.

4. SAME — MORTGAGES — FORECLOSURE DENIED WHERE UNFAIR TO STOCKHOLDERS.

   In a suit to foreclose a mortgage on an apartment house owned by a corporation, the various transactions by its officers resulting in the giving of the mortgage without any compensation passing to it or to any one for its use or benefit, *held*, so disadvantageous and detrimental to the interests of the stockholders that it should not be enforced.

[1]Corporations, 14a C. J. § 1887; 7 R. C. L. 482; 2 R. C. L. Supp. 375; 4 R. C. L. Supp. 486; [2]Id., 14a C. J. § 1887; [3]Id., 14a C. J. § 1888 (Anno); [4]Id., 14a C. J. § 2652.

5. CONTRACTS—RATIFICATION—KNOWLEDGE OF FACTS NECESSARY.
    While ratification of contracts may be express or implied,
    there can be neither express or implied ratification unless
    there is knowledge of all the material facts relating to
    the unauthorized acts of the parties to such contract.

6. CORPORATIONS—RATIFICATION BY OFFICERS.
    Officers of a corporation could not ratify that which they
    could not do originally.

Appeal from Wayne; Dingeman (Harry J.), J.   Submitted October 11, 1927.   (Docket No. 67.)   Decided January 3, 1928.

Bill by the Old Mortgage & Finance Company against the Pasadena Land Company and others for the foreclosure of a mortgage.   From a decree dismissing the bill, plaintiff appeals.   Affirmed.

*Lucking, Hanlon, Lucking & Van Auken* (*Harry Helfman*, of counsel), for plaintiff.

*Joslyn, Joslyn & Joslyn*, for defendants.

CLARK, J.   Plaintiff's bill for foreclosure of a mortgage was dismissed and it has appealed.   Appellant's counsel, at the hearing here, argued impressively and in chief that the mortgage had been given in the interest and for the benefit of Detroit Mortgage Company and therefore ought to be sustained. .

After a study of the record, we are in accord with Judge Dingeman's opinion, which is adopted as our own:

"This is a proceeding brought by the plaintiff against defendants, Pasadena Land Company and Detroit Mortgage Corporation, to foreclose a mortgage bearing date of November 1, 1923, executed by defendant Pasadena Land Company to plaintiff, to secure its note in the sum of $126,000, the note bearing the same date as the mortgage.   Defendant Detroit Mortgage Corpora-

---

[5]Agency, 2 C. J. §§ 93, 103; 7 R. C. L. 664; 2 R. C. L. Supp. 429;
[6]Corporations, 14a C. J. § 2234.

tion is made a party by the bill of complaint for the reason that the record title to the property was in it at the date of the filing of the bill. The defendant Charles J. DeLand, as receiver of the Detroit Mortgage Corporation, was permitted to intervene and to file a separate answer. Many hundreds of pages of testimony have been taken, and the taking of testimony occupied upwards of from 12 to 15 days. Much of this testimony is important only as bearing upon the past relations of the three corporations involved. The facts material to a determination of the issues are as follows:

"The Detroit Mortgage Corporation is a Delaware corporation, organized to deal in real estate, land contracts, and mortgages, to act as trustee under mortgages securing the payment of bonds, and for other purposes. It was organized early in 1917 and about the middle of that year Ben B. Jacob, Charles J. Higgins, and Frederick D. Gleason, three members of its board of directors, were appointed as its executive committee and they continued to so act until after the mortgage in question was given. Plaintiff is a Delaware corporation organized in 1919 by and through the active efforts, largely, of the said Ben B. Jacob and Charles J. Higgins; most of the directors of the Detroit Mortgage Corporation became directors of the Old Mortgage & Finance Company in 1919, the name of the company being originally World's Securities Corporation, then Old Securities Corporation, and later its present name. Ben B. Jacob was a vice-president of plaintiff from 1919 to 1922; Charles J. Higgins was plaintiff's treasurer and manager from 1919 to March or April, 1922, and was its secretary in January, A. D. 1923, and signed the contract dated January 13, 1923, and as a result and outgrowth of which contract the mortgage now in dispute was given.

"The Pasadena Land Company was organized by Jacob, Higgins, and Gleason and one Leon H. Hamburger, an employee of Ben B. Jacob, by the execution of articles of incorporation bearing date of June 3, 1920; these articles were filed with the secretary of State on June 9, 1920, and with the clerk of Wayne county on the 1st day of July, 1920. A history of the Pasadena Apartments deals and its relations to the Detroit Mortgage Corporation is necessary to a full

understanding of the issues involved, and the material parts are as follows:

"April 21, 1920, Charles J. Higgins made a written offer to the then owner of the Pasadena Apartments to purchase the property at $750,000, the offer being accompanied by his check for $10,000.   May 12, 1920, the minutes of the meeting of the board of directors of the Detroit Mortgage Corporation show the recital of an offer from the Detroit Realty Company to sell the Pasadena Apartments for $750,000 with a down payment of $150,000, balance to be paid in instalments under a land contract; then follows a resolution as follows:

" 'It was moved and seconded that the executive committee be directed to take steps to secure the purchase for the corporation of the Pasadena Apartment house and the adjoining property to the west at the price of $750,000 and $65,000, respectively, total $815,000, provided they could first secure a responsible purchaser for the same at $1,000,000 net to the company with a down payment of at least $50,000 and on terms as nearly as possible similar to those required in the proposition submitted, and to report the entire matter to the special meeting to be called by the vice-president and general manager, at which meeting suitable resolutions could be presented and passed, and the deal ratified.   Carried.'

"Jacob, Higgins, and Gleason were directors at the time and constituted the executive committee of the Detroit Mortgage Corporation.   On May 19, 1920, the Detroit Realty Company entered into a land contract to sell the Pasadena Apartments to Charles J. Higgins and Frederick D. Gleason at the price of $750,000, the contract reciting a down payment of $150,000 in cash.   This contract was not delivered until on or about June 19, 1920, when final payment of the $150,000 was made.

"Adjoining the Pasadena Apartments on the west was a piece of land on which there was an old three-story house and it was apparently deemed advisable to acquire this property as a protection to and in connection with the Pasadena Apartments.   Hereafter the Pasadena Apartments will be referred to as Parcel A and the adjoining land as Parcel B.

"On May 22, 1920, Parcel B was deeded by the then

owner to Charles J. Higgins, the testimony showing that the purchase price was $65,000 with a down payment of $32,500 and a mortgage back for the balance of $32,500.      This property was conveyed by Higgins and wife to the Detroit Mortgage Corporation on June 7, 1920, subject to the part purchase mortgage thereon for $32,500.

"On June 9, 1920, at a meeting of the board of directors of the Detroit Mortgage Corporation, Charles J. Higgins, as secretary, reported that the executive committee had organized a corporation to purchase Parcel A and Parcel B adjoining, that they, the executive committee, had individually taken a financial interest in the corporation in order to protect the interest and investment of the Detroit Mortgage Corporation and to see that the contract of sale was carried out; also that the initial payment of $50,000 had already been deposited with the Detroit Mortgage Corporation.      No deposit of $50,000 or any other amount had in fact been made with the Detroit Mortgage Corporation.      On the same day the land contract from the Detroit Realty Company to Higgins and Gleason was assigned to the Detroit Mortgage Corporation and it assumed the payments called for therein.

"The articles of association of the Pasadena Land Company recite a capital stock of $75,000—all subscribed and all paid in in cash, the stock subscribed by each being as follows:

"Charles J. Higgins $25,000, Frederick D. Gleason $25,000, Ben B. Jacob $24,900 and Leon H. Hamburger $100.      The testimony discloses that the only cash paid in by the incorporators or others was as follows:

"Charles J. Higgins, amounts paid on Parcels
  A and B, and not to the corporation........$25,000.00
Fred D. Gleason, a/c of his stock, but paid on
  the land contract.........................  12,000.00
Detroit Mortgage Corporation, for balance of
  Gleason's stock, also applied on contract... 13,000.00
                                              _____
      Total...............................$50,000.00

"Jacob claims to have given his notes to Higgins for $25,000, but the note was not produced nor was any evidence of any payments thereon satisfactorily established.

"The total amount required to pay the down payments on Parcels A and B was $182,500 and the books of the Detroit Mortgage Corporation show that it advanced moneys for the purchase under an account known as 'Accounts Payable — Pasadena Account.' The ledger sheet for this account could not be located at the time of the trial, but entries from the cash books and journals show this account to be as follows:

"ACCOUNTS PAYABLE—PASADENA ACCOUNT.

| "1920 | | Dr. | Cr. |
|---|---|---|---|
| "June 1. | Check No. 5947 to Charles J. Higgins | $27,996.50 | |
| June 4. | Check No. 5981 to F. D. Gleason | 13,000.00 | |
| June 4. | Check No. 5983 to Chas. J. Higgins | 50,000.00 | |
| June 14. | Check No. 6061 to Chas. J. Higgins | 153.58 | |
| June 19. | Check No. 6087 to Chas J. Higgins | 50,000.00 | |
| June 24. | Check No. 6103 to Detroit Realty Company | 3,802.73 | |
| June 26. | Journal entry—credit on L. C. 528—Pasadena | 50,000.00 | |
| Dec. 1. | Credit Monroe-Booth a/c Journal 682 | 1,000.00 | |
| June 26. | By refund of check 6103 | | $3,802.73 |
| July 28. | Journal, page 565, accounts payable Pasadena Land Co., 528 | | 182,500.00 |
| | Excess of payments over credits | | 9,540.08 |
| | | $195,842.81 | $195,842.81 |

"The excess of payments made by the Detroit Mortgage Corporation over the credits in Pasadena accounts was in April, 1921, transferred as an additional account due on the Pasadena land contract No. 528.

"Land contract No. 528 before referred to was the contract between the Detroit Mortgage Corporation and Pasadena Land Company as vendee, under which Parcels A and B were to be sold by the Detroit Mortgage Corporation to Pasadena Land Company. This contract called for the payment of $1,000,000 as the

purchase price and it was negotiated and executed by Jacob, Higgins, and Gleason as representing the Detroit Mortgage Corporation and by the same men as the record owners of all of the capital stock of the Pasadena Land Company, Higgins and Gleason, as before stated having the contract for the purchase of Parcel A. The Pasadena Land Company collected the rentals from Parcels A and B, ranging from $9,000 to $13,000 or more per month, but was unable to make the payments called for in the contract and in the meantime the Detroit Mortgage Corporation was making payments to the Detroit Realty Company on the Gleason and Higgins land contract largely in excess of the amounts received by it. Although the Pasadena Land Company was unable to make its payments on land contract No. 528, yet on April 26, 1922, the Detroit Mortgage Corporation made a new land contract by which it agreed to sell Parcels A and B to the Pasadena Land Company for $1,050,000 instead of $1,000,000 as originally contracted for. This additional $50,000 so added to the contract price to be paid by the Pasadena Land Company was charged to the Pasadena Land Company and to offset this charge assets of the Detroit Mortgage Corporation were turned over to Ben B. Jacob, and Fred D. Gleason as a payment for their stock in the Pasadena Land Company, it appearing that their stock was purchased on April 27, A. D. 1922, by Charles J. Higgins under a written agreement by which he, Higgins, agreed to give them, Jacob and Gleason, a credit on the books of the Detroit Mortgage Corporation in the sum of $25,000 each. The new contract for $1,050,000 was known as L. C. No. 643. The Pasadena Land Company was unable as under its former contract No. 528 to make the payments called for in the new contract for $1,050,000 (No. 643).

"The Old Securities Corporation was not successful and from 1919 to 1922, it had sold considerable of its stock, but had a large deficit. In March, 1922, Jacob and Higgins made a contract to turn all of its stock over to two men, Kloss and Thackera, under such conditions that there would be only from $75,000 to $100,000 outstanding and they agreed to turn over assets of the full value of the outstanding stock; this they did, turning over, among other assets, a mort-

gage of $87,000 on some 2,300 acres of land in Newaygo county, Michigan. This mortgage, it appears, was loaned to Jacob and Higgins, and Kloss and Thackera soon learned that it was valueless; they claimed that other assets turned over by Jacob and Higgins were not of the value represented and they also claimed that the Old Securities Corporation had debts and liabilities not disclosed by Jacob and Higgins when the Old Securities stock was turned over.

"In December, 1922, Mr. Kloss came to Detroit from Philadelphia and demanded assets of real value, and threatened Jacob and Higgins with arrest if such assets were not forthcoming. Kloss employed attorneys in Detroit and negotiations were entered into for the furnishing of proper and good assets or security. The stock of the Pasadena Land Company was offered to Kloss but refused because of its being of no value on account of the existing contracts and mortgages. After many days of negotiating, an agreement was finally made and various contracts executed on January 9th and 13, 1923, by which, among other things the Detroit Mortgage Corporation agreed to buy from Jacob and Higgins the stock of the Pasadena Land Company for $131,162.69, that being the amount agreed upon as the deficit of the Old Securities Corporation. For this amount Jacob and Higgins gave their note and to secure the payment of this note the Detroit Mortgage Corporation turned over to Old Securities Corporation or to Kloss and Thackera representing it, all of the stock of the Pasadena Land Company. Higgins testified that the Detroit Mortgage Company did not want to buy the stock of the Pasadena Land Company and he signed the contract of January 9th only because of the threats of arrest. Simultaneously with the sale and pledge of the stock and as a part of the negotiations a contract was made on January 13, 1923, between Wallace & Company, as brokers, the Old Securities Corporation and Jacob and Higgins, by the terms of which Wallace & Company were to sell the stock of the Old Securities Corporation and a certain percentage on the selling price was to be used in redeeming the amount of the $131,162.69 note of Jacob and Higgins, but any such payments and reductions were to be paid, ultimately to and for the

use of Jacob and Higgins. Under this contract various credits were given on the said note and up to November 1, 1923, the amount owing on the note had been reduced to $126,000. The negotiations for the purchase of the stock of the Pasadena Land Company by the Detroit Mortgage Corporation, the turning of the same over to the Old Mortgage & Finance Company as collateral to the note of Jacob and Higgins and the contract between Wallace & Company and Jacob and Higgins were all carried on by Jacob and Higgins for the Detroit Mortgage Corporation and for the Pasadena Land Company, by Kloss and his attorneys for the Old Mortgage & Finance Company and at the same time Higgins was the secretary of the Old Mortgage & Finance Company, and executed its contract with Wallace & Company, Higgins and Jacob, as its secretary. That contract was drawn and executed in Michigan at a time when the Old Mortgage & Finance Company, a Delaware corporation, had not been authorized to transact business within this State.

"The mortgage here being foreclosed was given to take up the note of Jacob and Higgins for $131,162.69, on which a balance of $126,000 was owing on November 1, 1923, and on the execution of the mortgage the Jacob and Higgins note was surrendered to them and the stock in the Pasadena Land Company was surrendered by plaintiff to the Detroit Mortgage Corporation.

"The applicable legal principles may be briefly summarized as follows:

"While contracts between agents of the corporation occupying positions of trust and confidence and a corporation fairly entered into and honestly executed, where no one is defrauded or overreached, are not necessarily invalid, such contracts will always be scrutinized with jealous care by courts, to see that no advantage is taken of the corporation or the rights and interests of its stockholders jeopardized. Officers of a corporation may deal with it in good faith if their acts are fair, open and known to the directors and stockholders. Such contracts are not absolutely void, but they are voidable at the election of the party whose interest has been so represented by the party claiming under it.

"If a third person join with a corporate officer in

dealing with the corporation, with knowledge that he is such officer, the contract may be set aside as to him as well as the corporate officer. This is upon the theory that where a stranger participates with the officer of a corporation in the commission of an act of manifest bad faith or breach of duty to it, he, equally with the officer, commits a wrong and ought not to derive profit from it.

"Applying these principles to the facts as established by the evidence, the court concludes as follows:

"*First.* The Pasadena Apartments, both Parcels A and B, were purchased for the Detroit Mortgage Corporation. It was fully paid for at the time, or later, with the money and property of the Detroit Mortgage Corporation and was at all times legally and in fact owned by the Detroit Mortgage Corporation.

"*Second.* That the Pasadena Land Company was organized under such conditions and circumstances, and its capital stock, so far as it was paid for, was so largely, if not fully, paid for by the Detroit Mortgage Corporation, that as between Jacob, Higgins and Gleason, and the Detroit Mortgage Corporation, the stock of the Pasadena Land Company was at all times owned by, and was the property of, the Detroit Mortgage Corporation.

"*Third.* That the alleged purchase of the stock of Pasadena Land Company by the Detroit Mortgage Corporation was a purchase of the stock which it already owned and that the agreement to purchase was wholly without consideration, a nullity and void.

"*Fourth.* Regardless of the ownership of the Pasadena Apartments and the Pasadena Land Company at the outset, it appears that the Detroit Mortgage Corporation was not indebted to the plaintiff in any sum until the action of the board of directors of the Detroit Mortgage Corporation at its meeting of January 12, 1923, and that the result of that transaction was the assumption of a debt of Higgins and Jacob by the Detroit Mortgage Corporation.

"*Fifth.* That the execution and delivery of the mortgage here sought to be foreclosed and enforced was wholly without any consideration passing to the Detroit Mortgage Corporation or to any one for its use or benefit.

"*Sixth.* That the result of the various transactions

between the plaintiff and Higgins, Jacob and Gleason and the Pasadena Land Company and the Detroit Mortgage Corporation were so disadvantageous and detrimental to the interests of the stockholders of the Detroit Mortgage Corporation that the mortgage which resulted from such transactions should not be enforced.

"*Seventh.* That the Old Mortgage & Finance Company had full knowledge of the relations between the Detroit Mortgage Corporation, the Pasadena Land Company and Jacob, Higgins and Gleason, by reason of Mr. Higgins being, at all times up to the 27th day of April, 1922, the treasurer and manager of the Old Mortgage & Finance Company and its secretary when the Pasadena stock was turned over to it as security.

"Much stress is laid upon the claim of ratification, and many acts are pointed to as forming the basis for this claim.    Ratification may be express or implied. There can be no ratification either express or implied unless there is knowledge of all the material facts relating to the unauthorized acts.    There was no express ratification.    It is urged, however, that various dealings with the property in question, the retention of improvements thereon, etc., constitute an implied ratification.    If the property in question always belonged to the Detroit Mortgage Corporation, it had a right to deal with it as its own.    Some claimed acts of ratification are based upon the actions of Higgins, Jacob and Gleason.    They could not ratify that which they could not do originally.    The dealings with the property by the board of directors selected after Higgins, Jacob and Gleason had resigned do not appear to have been had with full knowledge of the material facts as developed at the hearing in this case. Under these circumstances the claim of ratification must fail."

See, *McKey* v. *Swenson*, 232 Mich. 505.

Decree affirmed, with costs to appellees.

FLANNIGAN, C. J., and FELLOWS, WIEST, MCDONALD, BIRD, and SHARPE, JJ., concurred.

The late Justice SNOW took no part in this decision.