[No. 27536. Department One. March 19, 1940.]

CHARLES P. ROBBINS, *Appellant*, v. HUNTLEY CATTLE COMPANY *et al., Respondents.*[1]

[1]Reported in 100 P. (2d) 386.

*Thomas A. E. Lally, John J. Lally,* and *Williams, Williams & Cooney,* for appellant.

*Tustin & Chandler* and *Clyde H. Belknap,* for respondents.

ROBINSON, J.—This is an equity action involving the business relations of several corporations and numerous individuals over a period of more than fifteen years. A dozen or more major transactions were thoroughly probed during the course of the trial. The abstract of the oral evidence, although in printed form, is five hundred and fifty pages in length, and it is supplemented by sixty-seven depositions and documentary exhibits, many of them very voluminous. The facts are so intricate and involved that appellant's counsel found it necessary to devote the first one hundred and forty-five pages of their brief to the preliminary statement neces-

sary to supply a basis for an understandable assignment of errors.

The ordinary technique of preparing a judicial opinion must break down in the face of such a mass of material. It will be impossible to do more than outline the facts, and, in doing so, some matters of considerable importance will, of necessity, be omitted. Nor will it be possible to adequately discuss the many contentions presented. We can do no more than deal briefly with one or two of the major questions and rule summarily upon the others.

The action grows out of the liquidation of The Exchange National Bank of Spokane. The bank was taken over by the comptroller of the currency in January, 1929. One Baldridge was receiver until the following June 29th, when he was succeeded by James A. Drain, who, in turn, was succeeded by Thomas A. E. Lally on July 1, 1934. In due course, all of the creditors of the bank were paid in full, and its remaining assets, including $13,000 in cash, were, on September 16, 1936, transferred to Charles P. Robbins as stockholders' agent. As such agent, he instituted this action in November, 1937, against the two Huntley corporations, William Huntley, his wife, a number of the Huntley sons and daughters, and various tenants of certain lands involved in the suit.

For approximately twenty years prior to the bank's suspension, William Huntley, the central figure in this action, had been either its president or chairman of its board of directors, and he was a member of its financial committee during the entire period. He was engaged in other ventures.

In 1910, he entered into an agreement with his first wife to form a corporation to which all their assets should be conveyed for the benefit of themselves and their children; the corporation to have a capital of

$1,200,000, divided into 1,000 shares of preferred and 11,000 shares of common, the preferred to be issued to Mrs. Huntley and 1,000 shares of common to himself and 1,000 to each of their ten children, the children's shares to be held for them for a period of twenty years by the Mechanics' Loan and Trust Company. Huntley was to receive a salary of $1,000 per month, and Mrs. Huntley, a dividend of at least $300 per month on her stock. This agreement was later extended beyond the twenty years, with various changes, one of which reduced Huntley's salary to $250 a month.

Pursuant to the agreement, the Huntley Investment Company was incorporated in the state of Washington in 1910. Among the assets transferred to the corporation were 1,080 shares of the capital stock of The Exchange National Bank. It seems that, notwithstanding the terms of the agreement, twenty shares of the bank were retained by Huntley in his own name. Shortly after the organization of the corporation, Huntley transferred to it a block of stock in the Mechanics' Loan and Trust Company, and it appears that, as president of the trust company, between 1918 and 1930, he continuously voted its holdings of investment company stock at meetings of the investment company.

In October, 1918, Huntley, his present wife, and two of the Huntley sons organized another Washington corporation, the Huntley Cattle Company, to which was transferred a cattle ranch near Wisdom, Montana, known as the Home ranch. In time, other lands were acquired, and its holdings expanded to approximately 20,000 acres. Most of the cattle company's assets and working capital were furnished by the investment company, which, in time, became the owner of all its stock.

On October 31, 1922, the cattle company mortgaged to Alonzo Murphey, as trustee, to secure a note issue of $50,000, the Home and Francis ranches, approximately

5,600 acres of the Montana lands. All of the notes so secured were personally endorsed by Huntley.

On the following day, November 1, 1922, the investment company mortgaged to Prudential Life Insurance Company of America approximately 5,600 acres of wheat lands in Whitman county, Washington, to secure a loan of $200,000.

The next date of importance is May 1, 1928, for on that date the first of the transactions which form the basis of this action took place. At that time, if our computations are correct, the investment company was indebted to the Spokane Exchange National Bank, and to other firms and individuals, including the indebtedness secured by the Prudential mortgage, in the amount of $459,530. The cattle company was also heavily indebted. Its indebtedness, including the amount secured by the Murphey mortgage, amounted to $347,440. Of this amount, $113,382.02 was with respect to money borrowed from the investment company.

On that date, May 1, 1928, the cattle company executed to Clark and Ralph Huntley, sons of William Huntley, a bill of sale conveying to them 800 cows and heifers, 530 steers, 25 bulls, 125 horses, and all equipment, machinery, household goods, and furniture on the Home and Francis ranches, including also all hay on those ranches, which, taken together, seems to have been almost all of the tangible personal property of the corporation. In return, Clark and Ralph Huntley executed a note in favor of the cattle company, payable one year after date, for $112,000, and a chattel mortgage on the property to secure payment of the note. At the same time, the cattle company leased to them the Home and Francis ranches at a yearly rental of $2,500, the first year's rental being included in the note for $112,-000. This note was transferred by the cattle company to the investment company, endorsed by William Hunt-

ley, and discounted by the Exchange National Bank. The proceeds were, apparently, used to pay debts of the cattle company or of the investment, or both. This note was subsequently paid, one-half before the bank became insolvent in January, 1929, and the other half was subsequently paid to its receiver.

In February, 1929, shortly after the failure of the bank, all stockholders of the cattle company transferred their shares to the investment company. It appears that, by this time, practically all the indebtedness of the cattle company, except its mortgage indebtedness to Alonzo Murphey, trustee, had been paid, and that substantially all the indebtedness of the investment company, except its indebtedness to the bank and the Prudential Life Insurance Company, had been paid. In addition to its general indebtedness to the bank, however, there was the matter of superadded liability with respect to 1,039 shares of the bank stock.

On December 9, 1930, Drain, the then receiver of the bank, was elected a member of the board of trustees and vice-president of both the investment company and the cattle company. Six days later, the investment company executed two notes to Drain as receiver, one for $101,467.31, the other for $77,141.37. The larger note represented the superadded liability. On the same day, the investment company mortgaged the Whitman county lands, previously mortgaged to the Prudential Life Insurance Company, to secure these notes and, further, such advances as the receiver might be required to make to protect his lien. On the same day, the cattle company mortgaged all the Montana lands to Drain as receiver, to secure the aforesaid investment company's notes and, likewise, any future advances which the receiver might make to protect the lien. The receiver thus secured a lien on all of the Montana lands, although it was junior to the prior lien of the Murphey

mortgage as to some 5,000 odd acres, that is, the Home and Francis ranches.

There followed a period of quiescence lasting for several years. In the meantime, the two Huntley boys occupied and used the Montana lands in carrying on their cattle business. Drain's own deposition shows that they did this with his consent and by his sufferance. They testified that they agreed with him to keep the fences and ditches in order. During this period, Mr. Drain was supervising the liquidation of three other national banks. That may have been, in part, the reason why matters were, more or less, allowed to drift; or, quite possibly, he expected, this being in the early thirties, that the depression had struck bottom and that an upturn would solve all problems.

But, as the years went by, the mortgagees became restive. The receiver made advances to prevent foreclosures, in each case about twenty thousand dollars. However, in March, 1934, further advances being refused, the Prudential instituted foreclosure proceedings against the Whitman county lands. Drain intervened in this suit and filed a cross-complaint for the foreclosure of his second mortgage, asking judgment, however, only on the $77,141.37 note. Judgments and decree of foreclosure were entered, and the property was sold June 30, 1934, to the Prudential Life Insurance Company, which bid the full amount of its judgment. There was no redemption from this sale.

On June 15, 1934, fifteen days prior to the foreclosure sale and just prior to the time Drain's period of the receivership came to an end, the investment company turned over all of its remaining assets to the receiver, with authority to sell them at public or private sale. The assets consisted of a large amount of property, including 1,139 shares of the capital stock of the Bohemian Brewing Company, which had been given great

potential value by the repeal of the eighteenth amendment to the Federal constitution in December, 1933.

In 1934, Alonzo Murphey, trustee, began proceedings in Montana to foreclose his mortgage on the Home and Francis ranches. A decree was entered in January, 1935, and the property was sold on May 1st to Murphey, trustee, for the full amount of the judgment, $27,030.98. There was no redemption, and, in due time, he received a sheriff's deed. On the day that property was sold, Murphey leased it to Clark and Ralph Huntley for one year at a stipulated rental of $1,500.

Late in 1934, Mr. Lally, having succeeded Drain as receiver on July 1st, foreclosed the mortgage held by him on the Montana lands. Judgment for $218,216.43 and decree of foreclosure were entered June 17, 1935, and the lands, except the Home and Francis ranches previously sold to Murphey, trustee, were sold to Lally, receiver, he bidding therefor the sum of $75,000. There was no redemption from this sale, and the title became fully vested in the receiver.

It was subsequently discovered that, on October 25, 1934, Clark Huntley had written a letter to Mr. Murphey, the body of which reads as follows:

"I understand that you are considering foreclosing the above loan, originally $50,000, balance $23,000, with interest due October 1, 1934, of $747.50 and the current year's taxes unpaid, the entire mortgage now being due.

"In case you desire to foreclose this mortgage, I would like an option to purchase the property covered by said mortgage from you when you obtain title to said property through foreclosure. I have authorized my attorney, Mr. Horace Kimball, of Spokane, to work out these details with you."

It appears further that an option was given by Murphey to Clark Huntley on the following October 27th, to purchase the property in case of foreclosure;

that foreclosure was promptly made; and that the option was subsequently exercised. It is altogether impossible to go into the evidence relating to this matter. To do so, would, of itself, require an opinion of more than average length. It may be noted, however, that it was shown that William Huntley was an endorser on the notes secured by the mortgage; that he had considerable to do with arranging the option; and that two deeds were placed in escrow, one in which the grantee was named as Clark Huntley, and, in the other, the space for the name of the grantee was left blank.

The redemption period on the Whitman county lands expired on June 30, 1935. It appears that, on May 17th, about two weeks before its expiration, the Prudential Life Insurance Company contracted to sell these lands, subject to rights of redemption, to Clark Huntley, the purchase price to be $200,000, of which $30,000 was to be paid down, the next $45,000 to be paid at $500 per year until the unpaid balance should be $125,000, at which time the property was to be deeded with a mortgage back. Again, the evidence is very voluminous. That William Huntley was active in arranging this purchase, and particularly in assisting his sons in the difficult task of getting together the down payment, is clear. Ample grounds were shown to at least justify a lively suspicion that he was a principal in the transaction.

The foregoing is a very condensed outline of the transactions and occurrences which led up to the institution of this action. When the stockholders' agent took over the remaining assets of the bank in September, 1936, it was manifest that, during the course of the preceding nine years, Clark and Ralph Huntley had acquired substantially all of the personal property of the cattle company (May, 1928), a contract to purchase the Home and Francis ranches (April, 1936), and a contract to purchase Whitman county lands (May, 1935);

and there were additional facts which indicated that William Huntley was, or might be, a member of the firm of Huntley Brothers. Furthermore, the Huntley Brothers were holding and claiming certain property of the cattle company, to which they seemed to have no right, and William Huntley appeared to have converted certain assets of both companies from time to time. These conversions justly aroused suspicion and gave to the whole course of events a somewhat sinister appearance.

The gist of this action, as pleaded, is conspiracy. It is alleged, in substance, that William Huntley and his sons and daughters conspired and entered into an unlawful scheme to waste the assets of the cattle and investment companies and refuse to use them to protect the companies from mortgage foreclosures, to the end that they might acquire the properties for their own private use. In a four-page prayer for relief, the plaintiff prayed that the lands be declared held in trust, that the proceeds thereof be impounded pending suit, and for various personal judgments against the defendants, and also for attorneys' fees "on the basis of the benefit conferred upon and received by said Huntley Investment Company and Huntley Cattle Company."

The trial court rejected the conspiracy theory and the theory that William Huntley was a partner or otherwise interested in Huntley Brothers, and also the contention that the lands were impressed with a trust. It entered a decree allowing certain recoveries, which decree, the appellant, in the concluding pages of his opening brief, contends, should be modified as follows:

"The decree unfortunately granted costs to appellant against the Huntley Cattle Company and the Huntley Investment Company, but allowed no costs against the personal respondents. As stated above, a more or less worthless money judgment was rendered against respondent William Huntley for $10,766.18, and judg-

ment against Ralph and Clark Huntley for the restoration of nearly $23,000 worth of property to the corporations. As the corporations were the alter ego of those personal respondents and it was shown conclusively that those respondents alone were responsible for the insolvent condition of the two corporations, they having stripped them of every vestige of property, costs should have been awarded personally against the three personal respondents.

"Appellant respectfully submits that the decree should be modified granting judgment against William Huntley, Clark Huntley, and Ralph Huntley;

"A.  For statutory costs;

"B.  For attorneys' fees in the sum of at least $5,000;

"C.  In the sum of $57,053.18, the total of the money misappropriations numbered 1, 3, 4, 5, 6, 7, 8, 9, 12, 13, and 16;

"D.  In the further sum of $57,480 for the use and occupancy of the lands owned by the Huntley Cattle Company in Montana;

"E.  In the further sum of $13,500 for the use of the water and State lands in Montana (Misappropriation No. 15);

"F.  Ordering restored to the Huntley Investment Company the lands involved in this suit in Whitman County, or the value of the equity at the time of their conversion, $110,000 (Misappropriation No. 11); and

"G.  Further ordering restored to the Huntley Cattle Company the Home and Francis Ranches in Montana, or the value of the equity at the time of their conversion, $20,000 (Misappropriation No. 10)."

We will discuss these matters briefly, item by item:

■  A.  The matter of costs was within the discretion of the trial judge, and we find no sufficient reason to interfere with the holding made.

■  B.  Attorneys' fees were prayed for on the basis of the benefits received by the cattle and investment companies as a result of the action.  It is stated, in the introductory matter preceding A, in that portion of the appellant's brief above quoted, that the judgment

against William Huntley is "more or less worthless." It is further stated that the judgment requires Clark and Ralph Huntley to restore property worth nearly $23,000. With this, we do not agree. The property ordered restored consists of 5,725 shares of the Ruby Water Company, 150 shares of the Dishno Water Company, 35 shares of the Yellowstone Packing Company, 4 shares of the Big Hole Creamery Company, and 200 acres of land, being purchased from the state of Montana upon contract.

The value given by appellant is substantially the value at which these properties were carried on the books, but there is testimony that some of these companies were completely defunct. There is evidence, we believe undisputed, that none of the stocks has any actual value, except the Ruby Water Company stock, and this, it was testified, was worth $1.30 per share, or $6,442.50. There is no evidence as to the actual value of the land contract other than may be inferred from the fact that the land was being purchased from the state for $2,800 on a contract upon which something more than $400 had been paid. Therefore, more than $2,300 must still be paid in order to get title. In any event, the value of the property recovered, and therefore, the benefit received by the cattle company, was less than $10,000.

Fifteen hundred dollars was allowed as attorneys' fees and made a lien on the property. This amount, though an insignificant return for the monumental amount of work done, is, we think, reasonably proportionate to the benefits received. Besides, it is very plausibly contended that any benefit the investment company will receive from the judgment in this case is theoretical rather than real. In this connection, also see *Tefft v. Schaefer*, 136 Wash. 302, 239 Pac. 837, 1119.

██ C. This contains eleven sub-heads relating to

alleged misappropriations amounting to $57,053.18, for which, it is contended, judgment should have been entered against William Huntley, Clark Huntley, and Ralph Huntley:

(1) In 1929, William Huntley paid to the receiver $2,095, the amount of the superadded, liability on twenty shares owned by him in The Exchange National Bank, with funds received by him from the sale of grain which belonged to the investment company. The court included this amount in the judgment against William Huntley. There appears to be no reason why recovery should be allowed against his sons.

(3-4) In 1928, about nine years before this action was brought, the investment company charged off its books an item against Clark Huntley of $179.35, and another of $105, and the cattle company charged off an item against Ralph Huntley of $1,000. We do not think that this plaintiff has shown, or could show, any right to recover as to these items.

(5) Appellant contends that there were included in the sale of shares of the Mechanics' Loan and Trust Company certain shares that belonged to the investment company, and that the investment company was entitled to $296 of the proceeds. The court found that the evidence was not sufficiently definite to prove that there was a misappropriation of funds of the investment company in connection with this transaction. Upon a consideration of the evidence, we see no reason to disturb that finding.

(6) In 1930, William Huntley withdrew funds of the investment company, amounting to $5,434.50, which he claimed he used to repay a loan from his mother's estate to the investment company. The appellant contends that there was no such loan, and that he used the money for his own purposes. The court held, we

think rightly, that the evidence was not sufficient to establish that contention.

(7) The evidence shows that Receiver Drain, at the request of William Huntley, released certain shares of the Diamond Elevator Company upon payment to him by Frank Garrett of $350, and that Garrett immediately thereafter disposed of the shares for $5,000 and turned the money over to Huntley. The court required William Huntley to account for the $4,650, and included the amount in the judgment against him. We see no reason why a judgment should be entered against the Huntley sons in this connection.

(8) In 1930, William Huntley paid to Murphey-Favre & Company three thousand dollars, under a written agreement that the amount should be applied on certain notes secured by the Murphey mortgage, provided the notes were not paid by the cattle company. This was done to prevent the foreclosure of the mortgage. Thereafter, Drain paid Murphey-Favre the amount of these notes, and Murphey-Favre returned to William Huntley the amount paid by him. Huntley testified that this payment was made at Drain's request, and that it was understood between them that the notes should be paid by Drain when he had received authority from the comptroller of the currency to pay them. Drain testified, in his deposition, that he did not recall any such arrangement. This deposition was taken in Washington about eight years after the event, and the great majority of Mr. Drain's answers to the eighty-eight interrogatories and sixty-seven cross-interrogatories was: "I do not recall," or "The record should show." The trial court held that there was no fraud or loss connected with this transaction, and we see no reason why that holding should be disturbed.

(9) Among the assets of the investment company turned over to the receiver were 105 shares of the capi-

tal stock of the State Bank of Wisdom. In 1930, Drain released the shares to William Huntley upon the payment to him of $105. Thereafter, William Huntley sold the shares to Capehart, the cashier of the State Bank of Wisdom, for $5,000. The court found that this was a sale by Drain, and that the $105 represented the value of the stock at that time. Concerning this transaction, there was a great mass of evidence introduced which we cannot discuss. We have examined it carefully and are of the opinion that it supports the court's finding.

We may say here, parenthetically, that there are three instances of purchase and sale involved in this action, as to each of which it is stoutly contended that only a portion of the real value of the thing sold was received. One of these is this State Bank of Wisdom stock; another concerns the Whitman county lands; the third is the sale by the receiver on February 27, 1936, of 1,139 shares of the Bohemian Brewery stock, turned over to the receiver by the investment company in June, 1934. This was subsequently sold at $46 a share, whereas it is contended, relying largely upon our opinion in *Theis v. Theis,* 196 Wash. 667, 84 P. (2d) 369, that it was worth more than three times that sum. In all of these situations, in our opinion, the contender for a higher price is relying, to a considerable extent, upon hindsight.

(12) Appellant claims that William Huntley misappropriated wheat allotment checks issued by the Federal government to the investment company for the year 1934 and subsequent years; that William Huntley, Clark, and Ralph should account for the proceeds of these checks. The court held that William Huntley did appropriate a number of wheat allotment checks, but, in amount, considerably less than plaintiff alleged. Here, again, there is an immense amount of conflicting testimony which we cannot discuss, but we are of the

opinion that the evidence supports the disposition which the court made of the matter and in allowing recovery against William Huntley, but not against Clark and Ralph Huntley.

(13) Plaintiff sought recovery of proceeds of the sale of grain grown on the Whitman county lands during 1935, 1936, and 1937, amounting to $22,831.02 over and above the amount applied on the contract of purchase. The evidence, as we shall see later, establishes the purchase of the lands by Clark and Ralph Huntley from the Prudential Life Insurance Company as a *bona fide* transaction, and that no funds of the investment company or the cattle company were used for such purchase. The grain sold by Clark and Ralph Huntley, and the proceeds thereof, belonged to them.

(16) Plaintiff sought recovery of the proceeds of a check for $115.25, issued by Stanley Brown to William Huntley. As far as we can determine from the evidence, which is somewhat obscure on this point, this money seems to have belonged to the Huntley boys. In any event, we are unable to see where the appellant had any interest in it.

D. As hereinabove stated, Mr. Drain testified that he permitted the Huntley boys to occupy the Montana lands by sufferance. They testified that they occupied them upon an agreement to keep up the ditches, fences, etc.; in short, to preserve the appearance of a going concern. Mr. Lally succeeded Drain as receiver in July, 1934, and continued as such for more than two years. Since he permitted the boys to remain upon the land without protest, we must assume, as the trial court did, that he knew of, or acquiesced in, their agreement with Drain. We are in accord with the position taken by the trial judge as to this matter and expressed in his memorandum opinion as follows:

"The Huntley boys could, of course, have been removed at any time, but they were not removed, and as I say, it was known to all concerned that they were occupying the premises under the above agreement, until the foreclosure proceeding in Montana. And so it does not seem right to me under such circumstances to now charge them with the use of these premises or with any sums claimed to be received from the sale of hay or pasture therefrom."

E. This involves two sections of land nominally leased to the cattle company by the state in 1934. Why the lease was taken in the name of the cattle company, does not appear. It had no cattle and was not contemplating acquiring any. It does appear, however, that the Huntley boys made all payments to the state with respect thereto, and it would seem to follow that they and not the cattle company, were entitled to the benefits of the lease.

■ Before discussing F and G, a further consideration of some general aspects of the matter seems desirable. The complaint, as before stated, alleged a conspiracy among the members of the Huntley family to strip the corporations of their assets, render them unable to pay the mortgages, and to acquire the assets in their personal capacities after foreclosure. It is the theory, apparently, that the alleged conspiracy, sometimes spoken of as "scheme," was entered into prior to May, 1928, for it is said, in appellant's brief, that the transfer of the cattle and other personal property to the Huntley boys on May 1, 1928, was the first "overt act." William Huntley, the court found, had, over the period of the next six or eight years, converted nearly $11,000 worth of assets. The court also found that the sons should return assets of something less than $10,000 in value, though their claim as to these assets was fairly arguable, and no fraud was shown.

But these amounts would not have prevented the foreclosure. It is quite impossible to escape the conclusion that the failure of The Exchange National Bank was the real cause of the foreclosure of the mortgages, for its failure created a superadded liability against the investment company for more than $100,000. On December 9, 1930, Receiver Drain became vice-president and director of both Huntley companies. Six days later the investment company gave him a note for $101,467.31, representing the superadded liability, and another for $77,141.37, representing other indebtedness, taking mortgages to secure these notes on all the lands involved in this action, together with further advances he might take to protect the liens. The cattle company mortgage included something like 1,500 acres of Montana lands not theretofore encumbered. In June, 1934, the investment company transferred to him all its remaining assets, including the valuable brewery stock. After that, there was nothing left to the companies with which to redeem, and no incentive to do so, since the redemptions would, in effect, be only for the benefit of the receiver.

It is not possible that any such future developments could have been anticipated in entering into a conspiracy or formulating a scheme in 1928. Surely, no one could have foretold the failure of the bank during the boom times of 1928-29. In fact, it is even now difficult to understand why the bank closed, seeing that it was able to go through a highly expensive and wasteful liquidation in a time of the utmost financial distress, and yet pay all its creditors and have assets left for a shareholder agent to collect and distribute.

However, not much insistence was placed upon the conspiracy theory in the argument before this court; but it was stoutly contended, through briefs and by oral argument, that, in any event, the Home and

Francis ranches and the Whitman county lands are unlawfully held by Ralph and Clark Huntley for the benefit of the members of the Huntley family, particularly their father, William Huntley. This contention is based upon evidence both particular and general. It is pointed out that, throughout the whole period, Huntley endorsed his sons' notes when they sought credit; that he assisted in working up both land transactions, and assisted in securing the money necessary for the down payments; that he, on some occasions, and particularly with reference to the purchase of the Whitman county lands, referred to himself as the purchaser; that he signed documents, even some checks, "Huntley Brothers by William Huntley," and much reliance is placed upon the fact that a blank deed was escrowed in purchasing the Home and Francis ranches.

In considering this evidence, it must be remembered, first, that this man was a father, and, second, that he had for many years held a high place in the financial circles of the Inland Empire, and that, in spite of the failure of the bank and the break-up of his other ventures, his name was still a potent force. It seems natural that he should employ it for the benefit of his sons when it could be of such use. As to his signing "Huntley Brothers by William Huntley," that is consistent with the relationship of agency, and, as to his representing, on one or two occasions, that he was a principal in these transactions, we think it may safely be said that there is no evidence in the record which shows that the sons ever acknowledged that, either by word or action. The blank deed is, in our opinion, sufficiently accounted for by evidence in the record. Nevertheless, there is sufficient in the record, when taken with some additional evidence, which might have warranted the court in holding that he had an

interest in the land transactions, provided that additional evidence be believed.

It appears that, less than a week before the trial was to take place, Mrs. Eunice L. McKevitt, one of William Huntley's daughters and herself a defendant in the case, boarded a train en route to Pasco. A man got aboard who had formerly been actively associated in business with her father for many years. According to his testimony, she asked him if he was going to testify at the coming trial. He said that he was. They talked about the case.

"Q. We want that conversation. A. Subject of our remarks, spoke about the boys being younger, better health than some of the other members of the family, thought best to convert these assets that had been in controversy to the two boys for the benefit of the other members of the family. Q. Did she refer—did she mention which of the boys? A. Clark and Ralph—only two boys there, of course, at that time, time of this conversation, was the two boys that are here. Q. And what, if any, companies did she mention in that conversation? A. Well, don't think she specifically stated at the time. She said the assets of these corporations were to be converted to the boys, had been done. Q. Can you answer—if you did—don't repeat. Did she state the reason that was being placed in the names of the two boys? A. Think I stated that in my answer to the previous question; they were younger, in better health and to conserve the assets for the benefit of the rest of the family."

Mrs. McKevitt, while admitting the meeting and a long conversation with the witness, categorically denied that she made any such admissions. On cross-examination, the witness testified, in part, that there had been a war on between himself and William Huntley for many years and it would continue "as long as I live and he lives." He further testified:

"Q. And I take it that you might go a little out of your way if you thought you could carry on this war-

fare? A. If I could deal him some of the misery he dealt me I would do so. Q. And I take it the fact that you are on the witness stand now in this lawsuit might that give you an opportunity to wage that warfare a little more than perhaps you otherwise could? A. I think that's true. Q. And I take it also that you have thought quite considerably just to what extent you could deal him a blow in this lawsuit? A. For twelve years, yes, sir."

This testimony indicates extreme bias, but such inferences as might ordinarily be drawn from that, are largely neutralized by the amazing candor of the witness. Nevertheless, there was ample reason for the trial court to conclude that the witness could not have heard, or understood, Mrs. McKevitt aright. She had been very active in the matters with which the action was concerned. She was a member of the board of directors of both the Huntley companies during most of the period of Drain's receivership, and participated, with her fellow directors, the receiver, and her father, in mortgaging all the lands of both companies to the receiver in December, 1930, and, again, in practically, though not technically, winding up the investment company by conveying all its remaining assets to the receiver in June, 1934. The property rights of two of her brothers, their honor, and the honor of her father and other members of her family were at stake in the action about to be tried. She was herself a defendant, directly charged with having actively engaged in carrying out the alleged conspiracy. A reading of her evidence, as it appears in the record, shows that she was a very intelligent woman. It is well-nigh impossible to believe that she would, on the very eve of the trial, voluntarily make the statements attributed to her to any one, and especially to one who, she must have known, had long been her father's bitter and unrelent-

ing enemy, and who had just told her that he was going to be a witness.

After reviewing all the evidence on the point under discussion, including a great deal not herein set out, and keeping in mind that the trial judge was entitled to form his own opinion as to the weight which should be given to the testimony of this witness, we are of the opinion that the trial court's conclusions, that there was no conspiracy and that William Huntley was not shown to be "Huntley Brothers" or a member of the firm of Huntley Brothers, should not be disturbed.

Starting from the finding that William Huntley is not a member of, or an associate in, Huntley Brothers, we feel that the solution of the remaining questions is comparatively simple, and may be arrived at without discussion of the trust fund theory, *alter ego,* the fiduciary relationship of corporate directors, or any other of the abstruse legal doctrines so much discussed in the briefs. The remaining questions are almost wholly factual; indeed, that may very nearly be said of the whole case.

■ ■ F. At the time the Huntley boys contracted to buy this property, they were not directors of either of the Huntley corporations, although they were stockholders. But stockholders may deal with a corporation at arm's length. *McMullin v. Westinghouse Estate,* 259 Pa. 281, 103 Atl. 57; 14 C. J. 868, § 1329.

They stood in no official fiduciary relationship to the corporation. If they were in any kind of fiduciary relationship, it must be one which equity will, in order to do justice, imply from the circumstances. We find no circumstances which would warrant such an implication. The property was sold under foreclosure on June 30, 1934. The receiver had a large second mortgage lien upon it. Fifteen days before the sale, he acquired all the remaining assets of the investment

company, including the brewery stock, thereby making it impossible for the investment company to redeem if it had, in view of the receiver's second mortgage, any incentive to do so. It is true the Huntley boys' contract to purchase was made about two weeks before the redemption period expired, but there is not the faintest intimation that redemption was contemplated or would have been made by anyone. Besides, the contract was made subject to the equity of redemption, and the plaintiff's predecessor in interest was in no way deprived of it.

Furthermore, the court found, after hearing a great deal of conflicting evidence, that they paid or agreed to pay, its full value at that time. This finding we see no occasion to disturb. Nor do we see any reason whatever why the Huntley boys were not as free to contract for the land as any other person would have been. It must be remembered that they did not purchase from the corporation itself. They bought it from an intervening purchaser. We see nothing whatever in the circumstances to justify equity in implying a trust *ex maleficio,* or any other species of trust.

G. Much that is said in the preceding paragraph applies to the purchase of the Home and Francis ranches. The facts are somewhat different, however, and the appellant's contention as to this purchase, at first blush, seems more plausible. The transaction in this instance was begun before foreclosure was made. See letter of Clark Huntley, hereinbefore quoted. It is urged that this letter caused the foreclosure, or, at least, encouraged it. But we are convinced that the trustee needed no such encouragement, and that all parties thoroughly understood that a foreclosure was inevitable and imminent.

The mortgage had been made in November, 1922,

and this was October, 1934. Drain had staved off foreclosure by making advances of nearly $20,000, having taken security for such advances by the mortgage on the balance of the Montana lands. His successor, Mr. Lally, refused to make further advances. Clark Huntley testified that, just prior to his writing the letter, Lally had been to Montana and inspected the land.

"Q. I will ask you whether or not he made any statement with reference to the value of the land, or otherwise, and tell what he said if you remember? A. I don't think he put any value on them, but he said he didn't think it was worth making principal payments and interest and taxes on it. Q. And he was there on the property at the time? A. Yes, we rode around to the different ranches with him, looked at them."

Mr. Lally himself testified as to this inspection visit:

"A. Of course, I didn't say the land had no value, I probably said the land was very very much over estimated in the conception I had of it before seeing it. Q. And did you make some statement as to whether the receiver would recommend advancement of any more money? A. I don't recall, but I very probably did. I don't know as I said it to those boys, but I probably did decide then and there that I wouldn't recommend any more advances. There had been made $20,000.00."

It was quite evident that a foreclosure would result under these circumstances, and Clark Huntley wrote the letter, hereinabove quoted, asking for an option, saying, in part:

"I understand that you are considering foreclosing . . . . In case you desire to foreclose this mortgage, I would like an option to purchase the property . . . ."

This impropriety, if, under the circumstances, it was an impropriety, was no more than that. Clearly, however the act be classified or characterized, it cannot

reasonably be thought to provide a sufficient foundation upon which to construct a trust *ex maleficio.*

We agree with the trial court that Clark and Ralph Huntley purchased both the Montana and Whitman county lands with their own money, plus funds which they borrowed from various sources and subsequently repaid. The fact that their father assisted them in these borrowings, we regard as immaterial.

Finally, we have not overlooked or disregarded the contention made by appellant to the effect that, admitting, for the sake of argument only, that William Huntley had no interest in the purchase of the lands and that the boys made the purchase with their own funds, still the fact that they employed their father as an agent to negotiate the transactions while he was still an officer of the Huntley corporations would warrant a holding that they held the lands in trust. The authorities cited in support of this branch of the argument are: 4 Fletcher, Cyclopedia of Corporations, § 2358; 6 Fletcher, Cyclopedia of Corporations, § 4029 (These citations are to Fletcher's original work. The text relied on will be found in the current edition under different section numbers.); *Attalia Iron Ore Co. v. Virginia Iron, Coal & Coke Co.,* 111 Tenn. 527, 77 S. W. 774; *Munro v. Smith,* 259 Fed. 1; *Public Shoe Stores, Inc. v. Goldstein,* 225 App. Div. 350, 233 N. Y. Supp. 73; *Old Mortgage & Finance Co. v. Pasadena Land Co.,* 241 Mich. 426, 216 N. W. 922; *Hoffman Steam Coal Co. v. Cumberland Coal & Iron Co.,* 16 Md. 456, 77 Am. Dec. 311; *Cumberland Coal & Iron Co. v. Sherman,* 30 Barbour (N. Y.) 553; *Blake v. Buffalo Creek R. Co.,* 56 N. Y. 485; *Young v. Columbia Land & Inv. Co.,* 53 Ore. 438, 99 Pac. 936, 101 Pac. 212, 133 Am. St. 844; *Coombs v. Barker,* 31 Mont. 526, 79 Pac. 1; *Cross v. West Virginia Central & P. R. Co.,* 37 W. Va. 342, 16 S. E. 587, 18 L. R. A. 582; *National Bank v. Insurance*

*Co.*, 104 U. S. 54, 26 L. Ed. 693; *United States v. Dunn*, 268 U. S. 121, 69 L. Ed. 876, 45 S. Ct. 451.

When these authorities are examined with the fact in mind that the sons were not buying from, or dealing with, either of the Huntley corporations, but, in the one case, with the Prudential Life Insurance Company, and with Alonzo Murphey, trustee, in the other, it will be seen that they are not in point. In our opinion, the employment of Huntley by his sons to assist them in negotiating for the purchase of the lands was not improper. He stood in no fiduciary relation to the vendors. If his sons had employed him to negotiate with respect to purchases to be made from the Huntley corporations, a wholly different question would be presented, and one to which most, if not all, of the authorities cited would be applicable.

The judgment and decree appealed from is affirmed.

BLAKE, C. J., MAIN, STEINERT, and BEALS, JJ., concur.