# STATE OF MICHIGAN

# COURT OF APPEALS

HOWELL PROMENADE, LLC,

Petitioner-Appellant,

UNPUBLISHED
June 9, 2015

v

No. 321267
Tax Tribunal
LC No. 433125

CITY OF HOWELL,

Respondent-Appellee.

Before: RIORDAN, P.J., and DONOFRIO and BECKERING, JJ.

PER CURIAM.

This case stems from petitioner's appeal of an assessment of its commercial property. Petitioner appeals as of right the Tax Tribunal's opinion and judgment, determining that the property had a true cash value of $2,088,160 for the 2012 tax year. Because the Tribunal's findings were not supported by substantial evidence, we vacate the Tribunal's opinion and judgment, and we remand for further proceedings.

## I. BASIC FACTS

This case involves the proper determination of a shopping center's true cash value as of December 31, 2011, under the General Property Tax Act (GPTA), MCL 211.1 *et seq.* Respondent initially assessed the property to have a true cash value of $3,022,400. Petitioner appealed that assessment, and the Tax Tribunal heard the appeal.

At the Tax Tribunal hearing, only petitioner was allowed to present evidence and exhibits because of respondent's failure to comply with the court's prior scheduling order. At the hearing, petitioner presented three witnesses: John Breza, Richard O'Connor, and Jason Krentler.

Arguably, the most important witness was Krentler, as he was a certified appraiser. Krentler's methodology was to first calculate the true cash value of the property as if the property was "stabilized and cured."[1] Then, because the property was not stabilized and cured,

---

[1] "Stabilized" refers to the property having a market vacancy rate, and "cured" refers to the fixing of the "deferred maintenance" items. "Deferred maintenance," in turn, is defined as the

-1-

he would deduct from that interim value the lease-up costs and the deferred maintenance costs to arrive at the property's true cash value in its condition as of December 31, 2011.

In calculating the stabilized and cured true cash values for the property, Krentler used two different methods: the sales-comparison approach and the income-capitalization approach. However, Krentler used the value derived from the income-capitalization approach because "as an income-producing property, ultimately the income capitalization approach is [most] determinative." Krentler determined that the true cash value of the property (as if it were stabilized and cured) was $2,100,000 under the income-capitalization approach.[2] According to Krentler, the next step was to deduct from that stabilized and cured value, the lease-up costs and the deferred maintenance costs to arrive at the true value of the property in its actual condition, i.e., not cured and not stabilized.

Regarding the lease-up costs, Krentler explained the following:

> In order to determine the market value as is, lease-up costs must be deducted from the indicated value as-stabilized. Lease-up costs include lost rental income attributable to vacant suites, unrecovered expenses such as real estate taxes, insurance, and common area maintenance, free rent, tenant improvement allowances, and leasing commissions.

Krentler also explained that the lease-up costs are to be discounted to present value using a discount rate of 5.0%.

Krentler summarized the lease-up costs as follows:

| | |
|---|---|
| Rent Loss | $41,022 |
| Expense Recovery Loss | $13,674 |
| Free Rent | $0 |
| Tenant Improvements | $65,780 |
| Leasing Commissions | $11,840 |
| TOTAL | $132,316 |
| Discount to Present Value (5.0%) | $125,378 |

Additionally, Krentler calculated an "entrepreneurial incentive," which he estimated to be 5.0% of the discounted lease-up costs, or $6,269, because "a buyer of the subject would expect a return on the costs associated with leasing the property."

As a result, Krentler had a rounded-total of $130,000 ($125,378 + $6,269) in lease-up costs, which he deducted from the stabilized and cured true cash value of $2,100,000.

---

"[n]eeded repairs or replacement of items that should have taken place during the course of normal maintenance." *The Dictionary of Real Estate Appraisal* (2010).

[2] The sales-comparison approach yielded a value of $2,200,000. Krentler noted that this value simply "is utilized as support to the income approach conclusions."

To account for the property not being "cured," Krentler also deducted the amount of money needed for "deferred maintenance" from the stabilized and cured value. Here, there was evidence presented that the HVAC system, the roof, and the parking lot were in need of repair. John Breza, who oversaw all management operations of the property, testified that these repairs did not happen for a couple reasons. First, he explained that they lacked the funds to do the work because of the property's low occupancy. Second, he mentioned that he thought the entire development may have to be knocked down and rebuilt, which would have made spending money on the repairs not prudent.

Breza supplied Krentler with estimates to repair the HVAC ($195,000), the roof ($111,500), and the parking lot ($170,152), which totaled a rounded amount of $480,000. Krentler noted that the "items appear reasonably categorized as deferred maintenance based on our inspection, but we are not engineers and are not qualified to opine on whether these items are structurally failing." As a result, Krentler then deducted the $480,000 in deferred maintenance expenses from the stabilized and cured true cash value.

In sum, Krentler took the property's $2,100,000 stabilized and cured true cash value and deducted $130,000 for lease-up costs and $480,000 for deferred maintenance to arrive at an "as is" true cash value of $1,490,000.

The Tax Tribunal noted that while it was not bound to accept either of the parties' theories of valuation, it did agree with Krentler that the income-capitalization approach, supported by the sales approach, was the appropriate method of valuation. As a result, the Tribunal accepted Krentler's stabilized and cured true cash value of $2,100,000 as accurate. However, the Tribunal disagreed on the amount to deduct from that value.

The Tribunal disallowed all of the deferred maintenance deductions for several reasons. First, the Tribunal noted that "in both his sales and income approaches to value, Mr. Krentler previously made condition adjustments for the difference in condition between the subject and the comparables." The Tribunal noted that in both the sales comparison approach and the income capitalization approach, Krentler made adjustments to the property's true cash value based on its condition compared with the condition of the comparables.[3] Thus, the Tribunal found that Krentler was making adjustments for the condition of the property twice, which it likened to "double dipping."

The Tribunal also found that Krentler provided conflicting testimony because he had "indicated that the subject property required no expenditures immediately after purchase."

---

[3] For instance, in the sales-comparison approach, Krentler noted that comparable 2 "is in similar condition to the subject property and no adjustment is necessary. Sale comparables 1, 3, 4, and 5 are superior in terms of condition and negative adjustments are applied [to the price of those four comparables]." And in the income-capitalization approach, Krentler stated that "[r]ent comparables 1, 4, and 5 are in similar condition to the subject and no adjustments are necessary. Rent comparables 2 and 3 are superior in terms of condition; therefore, negative adjustments are applied [to the price of those two properties]."

Furthermore, the Tribunal found it questionable that taking a deduction for the actual cost of deferred maintenance should be necessary in determining the fair market value of the subject property. It opined that "[c]ost does not equal market value"; thus, the "$480,000 spent on deferred maintenance does not equal a $480,000 increase in value." The Tribunal surmised that instead of being used to reduce the true cash value of the property, the costs for deferred maintenance could have been spread over a number of years, could have been included by Krentler in capital reserves, or it could have been included in the rental rate.

The Tribunal also disallowed most of the $130,000 deduction for lease-up costs, explaining:

> Mr. Krentler indicated in his appraisal that the market rate of vacancy and credit loss is 20%. He also noted that all his comparables were triple net leases. As indicated above, triple net leases include pro-rated amounts for CAM,[4] property insurance and property taxes. In his explanation of lease-up costs, Mr. Krentler includes unreimbursed CAM, property insurance and property taxes. As the aforementioned information suggests, the loss of those items was already accounted for in the vacancy and credit loss.

The Tribunal further noted that the rent comparables that Krentler used "all have similar tenant improvement allowances or rental concessions as compared to the subject." As a result, the Tribunal concluded that "rental concessions and tenant improvements are already accounted for in Mr. Krentler's income approach and no additional under the line adjustment is required." And because the only category unaccounted for in the lease-up costs was the leasing commissions, the Tribunal used that $11,840 deduction.

Furthermore, the Tax Tribunal determined that any deduction for an "entrepreneurial incentive" was not warranted because it found "it improbable that a purchaser of the property would 'expect a [5%] return on the cost associated with leasing the property.'" The Tribunal reasoned, "The purpose of purchasing an income producing property is to make a profit. As such, lease terms would be negotiated in order to make a property profitable."

Consequently, the Tribunal accepted Krentler's $2,100,000 true cash value appraisal and only deducted $11,840 for leasing commissions, resulting in a true cash value of $2,088,160.

Petitioner moved for reconsideration on three grounds. First, petitioner argued that the Tribunal misunderstood a portion of Krentler's testimony because, contrary to the Tribunal's finding, he never stated that "no expenditures were needed immediately after the sale of the subject property." Next, petitioner argued that Krentler did not "double dip" his condition adjustment. Finally, petitioner argued that Krentler properly deducted lost rent and tenant improvements as lease-up costs.

---

[4] CAM stands for "common area maintenance."

The Tribunal did not address petitioner's contention that it misunderstood Krentler's testimony regarding the property not needing any expenditures immediately after the sale. But the Tribunal conceded that it erred by characterizing Krentler's methodology as "double dipping" for any condition adjustments. Regardless, the Tribunal found that any error had no effect because $480,000 repairs on a $2,100,000 property reflects a much more serious issue than simple "deferred maintenance" and, as a result, this deeper problem should have been "reflected in appropriate sales and rental comparables." The Tribunal also ruled that "[l]ease-up costs, other than leasing commissions, were properly disallowed as the property should not have been valued as stabilized and cured." In sum, the Tribunal found that (1) Krentler's approaches valued the property "as stabilized and cured" and (2) it did not improperly reject Krentler's "below the lines deductions for deferred maintenance and lease up costs."

## II. ANALYSIS

Petitioner argues that the Tribunal erred when it accepted the appraisal value of the property as if it were in a stabilized and cured status but failed to make any deductions to reflect its value in its actual, uncured and unstabilized, condition.

> Review of decisions by the Tax Tribunal decision is limited. In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. The Tax Tribunal's factual findings are final if they are supported by competent, material, and substantial evidence on the whole record. [*Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527; 817 NW2d 548 (2012) (quotation marks and citations omitted).]

"Substantial evidence is any evidence that reasonable minds would accept as adequate to support the decision; it is more than a mere scintilla of evidence but may be less than a preponderance of the evidence." *Mich Ed Ass'n Political Action Cmty v Sec'y of State*, 241 Mich 432, 444; 616 NW2d 234 (2000).

Under the GPTA, the Tax Tribunal has a duty to determine the property's "true cash value," which is synonymous with "market value." *Forest Hills Co-operative v City of Ann Arbor*, 305 Mich App 572, 587; 854 NW2d 172 (2014); see also MCL 211.27(1). Here, the Tribunal accepted the methodology employed by petitioner's expert, Krentler, which resulted in an appraisal of $2,100,000. However, because Krentler viewed this $2,100,000 amount as the value of the property as if the property were in a stabilized and cured status, he made some deductions to reflect the actual unstabilized and uncured condition of the property. Krentler deducted $480,000 for deferred maintenance costs and $130,000 for lease-up costs, resulting in a final appraised value of $1,490,000. The Tribunal rejected all of these deductions, except for a portion of the lease-up costs constituting leasing commissions. Thus, with the $11,840 deduction for commissions, the Tribunal ended up with a true cash value of $2,088,160.

Petitioner claims that the Tribunal's ultimate finding on the property's true cash value was not supported by substantial evidence because the evidence clearly establishes that the

$2,100,000 value is the property's cured and stabilized value, and there is no dispute that the property was not cured and stabilized.

## A. DEFERRED MAINTENANCE COSTS

The Tribunal denied any deductions to account for the condition of the property for three reasons: (1) Krentler gave conflicting testimony regarding whether the property needed any expenditures immediately after any sale, (2) the condition of the property was already taken into account by Krentler's methodology because he adjusted the comparable properties based on their condition compared with the subject property, and (3) the cost of repairs does not translate to a one-to-one ratio for market value.

We agree with petitioner that the Tribunal's view—that Krentler suggested that the condition of the property made it so that no expenditures would be needed in the event of a sale—was not supported by substantial evidence. The Tribunal quoted from page 37 of Krentler's report, which provided under the section "Expenditures Immediately After Purchase":

> Some properties require the purchaser to make expenditures immediately after the acquisition of the property. For example, the local government may require safety problems to be corrected within a short period of time following the sale. Market participants consider these expenditures when buying and selling properties.
>
> No adjustments are necessary because none of the comparable sales required such expenditures immediately after the sale.

This section is located under the main heading, "Description of Adjustments," and from a review of that section, it is clear that these "adjustments" *are for the price of the comparable properties*. This is evident because after Krentler discusses each of the adjustment components in the report, the accompanying chart shows how the only prices that were adjusted were for the comparable properties. For instance, under "Conditions of Sale," because sale of property #3 appeared to be a liquidation scenario, Krentler applied a positive 25% adjustment to that property's sale price in order to make it more representative of true market value. Thus, because none of the comparable properties had any expenditures immediately incurred after the current owner acquired the property, no adjustments to those comparable prices were made. As a result, the Tribunal clearly erred when it concluded that Krentler was stating that no expenditures were necessary for the subject property.[5]

With respect to the Tribunal's second reason for disallowing any deferred maintenance deductions, it concluded that Krentler's methodology already took into account the condition of the property and that to make an explicit deduction was akin to "double dipping." In other words, the Tribunal opined that "Krentler is making adjustments for the present condition of the property, twice," i.e., in the condition adjustment and in the express "below the line" deduction

---

[5] As previously noted, the Tax Tribunal never addressed this aspect in its opinion denying petitioner's motion for reconsideration.

for deferred maintenance. But in its opinion denying petitioner's motion for reconsideration, the Tribunal acknowledged that it erred when it found that Krentler's methodology engaged in "double dipping."[6] Regardless, the Tribunal found that its other reasons for disallowing the deferred maintenance deduction were still valid. Consequently, we need not consider this reason since the Tribunal itself has disavowed its prior reliance on it.

Finally, the Tribunal relied on the fact that the costs for performing deferred maintenance do not equate to an equal deduction to get market value. In other words, the Tribunal opined that

> $480,000 spent on deferred maintenance does not equal a $480,000 increase in value. In the alternative, why would its market value decrease by $480,000 because of the potential costs of the repairs that are part of the cost of doing business?

The Tribunal's point on repair costs not directly equating to market value is well regarded. There was no evidence introduced that established that each dollar of needed repair costs results in a like reduction in market value. It is not hard to envision that not all maintenance items should be considered equally. Maintenance that needs to happen every year or two as opposed to every decade or two likely should be considered differently when considering the property's true cash value. Furthermore, the Tax Tribunal is allowed to apply its own expertise when determining the true cash value of property. See *Great Lakes Div of Nat'l Steel Corp v City of Ecorse*, 227 Mich App 379, 389; 576 NW2d 667 (1998).

However, the problem with the Tribunal's ultimate finding is that while it recognized that "repairs to the property are needed as suggested by Mr. Breza's testimony and exhibits P-2, P-3 and P-4 detailing needed repairs," it disallowed *any* deduction for the repairs.[7] It should come as no surprise that a property that is not cured should have less value than one that is cured, with all other things being equal. The question then becomes how much less? Evidence was presented that the property needed $480,000 in maintenance, but the Tribunal thought that a deduction of $480,000 was not warranted because repair costs did not equate in a one-to-one fashion to loss value. The difficulty is that the Tribunal never determined, given that the property purportedly

---

[6] Although the Tribunal did not elaborate on this, it appears that in order to avoid any "double dipping," the "Condition" adjustment that Krentler made on the comparable properties would have to relate to things other than merely maintenance, such as nicer or more modern amenities. For instance, if an upscale mall with modern amenities was being used to compare with an average mall with older amenities, while both may have no maintenance issues, the upscale mall likely will be considered as being in "superior" condition, thereby requiring a negative adjustment to its price to bring it in line with the subject property.

[7] While this was understandable when the Tribunal thought that Krentler gave conflicting testimony and that his appraisal already took the condition (or lack thereof) of the property into account, these reasons have been discredited because we have determined that Krentler did not give conflicting testimony and the Tribunal, itself, has acknowledged that it was wrong regarding any double dipping.

needed $480,000 in repairs, what percentage or portion of those repair costs would have been proper to deduct from the cured value.

In any event, we conclude that the substantial evidence does not support a deduction of $0. The Tribunal accepted Krentler's appraisal of $2,100,000 as if the property were stabilized and cured. Because the Tribunal acknowledged that the property was not cured, it erred when it concluded that *no* deduction was necessary to reflect its value in its uncured condition. On remand, the Tribunal is to determine the true cash value of the property in its condition as of December 31, 2011, which necessarily includes its state of repair. If the Tribunal concludes that it has insufficient evidence to determine the how much of the repair costs can be deducted from the cured value, it can elicit additional data from the parties.

### B. LEASE-UP COSTS

At trial, Krentler testified that a $130,000 deduction from the property's stabilized value was needed to reflect the fact that the property was not stabilized. Of that $130,000, the Tribunal found that only $11,840 in leasing commissions was appropriate to deduct. The Tribunal explained:

> Mr. Krentler indicated in his appraisal that the market rate of vacancy and credit loss is 20%. He also noted that all his comparables were triple net leases. As indicated above, triple net leases include pro-rated amounts for CAM, property insurance and property taxes. In his explanation of lease-up costs, Mr. Krentler includes unreimbursed CAM, property insurance and property taxes. As the aforementioned information suggests, the loss of those items was already accounted for in the vacancy and credit loss. Further, in his rent comparables, Mr. Krentler indicates that, "The rent comparables all have similar tenant improvement allowances or rental concessions as compared to the subject and no adjustments are necessary." In other words, . . . rental concessions and tenant improvements are already accounted for in Mr. Krentler's income approach and no additional under the line adjustment is required. In his appraisal, Mr. Krentler describes lease-up costs as "lost rental income attributable to vacant suites, unrecovered expenses such as real estate taxes, insurances and common area maintenance, free rent [rental concessions], tenant improvement allowances and leasing commissions." Of the highlighted items, the only category unaccounted for is leasing commissions of $11,840. [Citations omitted.]

The Tribunal also determined that the "entrepreneurial incentive" deduction, which Krentler estimated as being 5% of the total of his calculated lease-up costs, was not warranted because a purchaser would not "expect a [5%] return on the cost associated with leasing the property."

However, on appeal, petitioner does not address any of these reasons in challenging the Tribunal's decision to only deduct $11,840 for lease-up costs. Instead, petitioner cursorily avers that a deduction was necessary because the property was 27.5% vacant, which was over the "stabilized" rate of 18% and only focuses its argument on the lack of a deduction for the $480,000 deferred maintenance. Accordingly, to the extent that petitioner challenges the lack of deductions attributable to lease-up costs, that challenge is abandoned. See *Ypsilanti Charter Twp*

*v Kircher*, 281 Mich App 287; 761 NW2d 761 (2008) ("[Appellant's] failure to properly address the merits of his assertion of error constitutes an abandonment of this issue on appeal.").

### III.  CONCLUSION

Because the Tax Tribunal's ultimate finding related to the true cash value of the property was not supported by substantial evidence, we vacate the Tribunal's opinion and judgment.  We remand for the Tribunal to determine the proper amount to deduct from the $2,088,160 cured (but unstabilized) value[8] to arrive at the proper true cash value.  We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Pat M. Donofrio
/s/ Jane M. Beckering

---

[8] Note, that because petitioner failed to properly challenge the deductions related to the lease-up costs, the Tribunal's handing of those lease-up deductions is unaffected.